We have three cases this afternoon. The first one is number 17-2663, United States v. Jones. Mr. Ambrosio and Mr. Sanders. Whenever you're ready. Not a bad name, by the way. Thomas Ambrosio. Thank you, Your Honor. For the record, Thomas Ambrosio on behalf of Gregory Jones. It's nice to meet you, Judge Ambro, Judge Fisher, and Judge Escherpo. Your Honor, I'm going to be rebuttal on this case. That's fine. Judge, I don't even know if I need 10 minutes because this is a very simple case, fact pattern-wise, and there's one issue. The main issue here is, was there police or law enforcement actions that tainted an identification of witnesses that appeared at trial and testified against Mr. Jones? And my position is that the facts of this case establish that there was. So there was, what did the letter say? It was a victim witness letter to teller Ms. Ojeda, is that correct? Yes, yes. And it said for the May robbery that, what did it say? It said he was identified as the person that committed the robbery, and it's unclear, but we believe that there was indication that DNA evidence connected Mr. Jones to the May robbery. And what's important about the May robbery for this case and the analysis is that there was no identification of Mr. Jones by anybody in... Assume you're right. Assume we agree with you. Yes. Should we go to harmless error? There was DNA evidence tying Mr. Jones to the first robbery, right? There was, however, it seemed to have been tainted a little bit because... The DNA was tainted? There was, it was potential contamination because the DNA was found because there was a security guard, Officer Four, who was outside the bank and he saw the perpetrator leave the bank and discard a scarf, a kufi, and sunglasses, and also there was a dye pack. And when that was retrieved, it wasn't put in separate bags, and there was indication at trial that there could have been a taint, and there was a second DNA that did not match Mr. Jones. So it could have been another person that committed that robbery. So are you challenging, are you saying that this letter contaminated both the September conviction and the May conviction? Yes, because, Judge, I believe that they're intertwined and you can't separate them. And one of the points that I want to share... Well, how do you intertwine maybe September? Conceivably, I thought that was the argument, but how do you say we have somebody that we have identified through DNA as being a possible person who committed the May robbery? What's so wrong with that? It was the teller who was at the scene in May, on May 6th. That is correct. However, a major point is it was the DNA that linked Mr. Jones to the robbery. It wasn't his facial features or any distinguished remarks that allowed Ms. Jinty, who was the manager... In fact, she couldn't identify Mr. Jones at trial. Well, she did say the only thing she could identify was that the voices were the same. Yes, she did. However, at the trial, there was no voice request. There was no show up of Mr. Jones's voice at the trial. The government presumably could have required him to speak So you're saying that this letter, as a result of sending this letter, that there's a due process violation that had occurred. Okay, how would this letter, how would it be any different? Suppose they didn't send a letter, but through a police blog or whatever means, there was newspaper publicity that the police had arrested Gregory A. Jones for the Capital One bank robbery in May. And the teller read that newspaper story and did the same thing they did in this case. How would that be any different than sending a letter? I believe that would be different because in this case, Your Honor, the letter was sent by the Essex County Prosecutor's Office directly to one of the victims. They didn't have an obligation to send a letter to? That's what the government's making the argument that statute requires that that letter have been sent. There is a statute. You acknowledge the statute. Yes, I do. But I don't acknowledge that the statute overrides my client's due process. I understand that. I understand that. But you think that the letter is materially different as it relates to your challenge to a newspaper report of the arrest? Yes, Judge. Judges, I have tried many cases. And in my experience, I believe that when a witness is confronted by law enforcement or any agent of the government, whether it's FBI, a police officer, that they take that very seriously. And it's different. Judge Fisher, your argument was what's the difference between if it was on a blog? My example was, yeah. On the blog, it's ancillary noise. Maybe the person was being, was going to look at the blog. Maybe they're not. In this case, there was a letter sent directly to the victim. And it's my position that when government and law enforcement has direct contact with somebody that our constitutional hair should go up in the air. But it didn't say go on the internet and look up this picture. Absolutely not. And Judge, one of the things about this case that I feel is different is you have to take into consideration that this is the 21st century. Our notions of privacy and our notions of what the police can or cannot do and what law enforcement can or cannot put on the internet have changed dramatically. Many of the cases that were cited, both the briefs, took place before there was an internet. Our sense of obligation as to what is private has been skewed. Distinguish this with Perry. How is the police contact in this case, isn't it more attenuated than the police contact in Perry where the police were in the woman's apartment? In Perry, they weren't saying, there wasn't a letter where they said, this is the man. But the police officer's in the apartment, so you actually do have a confrontation. So you have the police with the victim in the case or the witness in the case, right? Yes, Judge. Together. Yes. And she opens the window and says, there's your man. How do you distinguish Perry from these facts? I think that it's different because in this case, you actually had the prosecutor's office sending a letter saying, this is the man. And in this case, Judge, what I'm asking for is that there be a hearing because without the hearing to determine if my client's procedural due process rights were violated, we're never going to know. It's pure speculation that what occurred at trial wasn't a violation of my client's due process rights. But you had the witness's testimony at trial. What more would you get from a hearing? In the hearing, Judge, one of the things that was made, a point made by the government in the brief was that, well, Ms. Ginty was, she wasn't asked if it affected her identification. And one of the key things when you're doing cross-examination is you generally never ask a question that you don't know the answer to and in this case, if the defense counsel said, did it have any effect on your ability to identify Mr. Jones? She could have said no, where the position is we would have wanted to argue, yes, it did. And I also suggest that the fact that Ms. Ginty couldn't identify Mr. Jones and the fact that she kind of took back the fact that she looked on the internet without permission, so to speak, I think deep down she realized that really wasn't right. It wasn't the just thing to do. But look at all the evidence that you've got. You've got DNA evidence that Jones committed the May robbery. You've got four, the security guard's description of the May robbery. You've got the teller in September, in-court identification of Jones as the September robber. You've got Jonty's testimony that the voices were the same. She did remember the voices and they seemed very similar. Then you have, of all things, you've got the videos that the jurors actually looked at. How can we say that we can step in and step in effect over what the jurors found? Judge, I'm glad you asked that question because I wanted to bring it up about the video. I guess I'm glad I asked it too. Judge, don't you find it concerning that Ms. Ginty, who was present at both of the robberies, watched the same video and she could not say that's the man that robbed me? They played the video for Ms. Ginty. She didn't. So I suggest that the video really, if the victim of the crime couldn't look at the video and say, yes, that's the man, then it's not proof beyond a reasonable doubt. The other major point to counter your argument, Judge Ambrose, is that robbery number two bolstered the identification of robbery number one. Because if you believe it was, you believe that Ms. Osador was able to properly identify Mr. Jones as the perpetrator of robbery number two, all that does is bolster the first robbery. Well, what bolsters the first robbery is DNA. If there was only one trial for the first robbery and not the second robbery, I submit there may have been... I thought you would say it was just a flip. What hurts him in September was using the DNA from May. Well, Judge, respectfully, if there was only a trial of the May robbery, then there would have been no identification. It would have only been DNA. Ms. Osador's testimony would have been irrelevant because she wasn't there for the first robbery. We would have had Ms. Ginty who would have said, I can't identify the person that robbed me. We would have been left with a suspect DNA sample because there were two DNAs in the clothing that was recovered. And there was testimony from the agent that it could have been... Let me ask you this one question. Your red light's on. Even if you were able to get by the question of whether or not the letter constituted impermissible state action, how can you show that this letter was unnecessarily suggestive? That ties in with my fact that we are in a different age, Your Honor, and jurors and witnesses go on the internet when they shouldn't. So what are we supposed to tell them? Well, in this case, Judge, they should not have... They should have done a lineup before they sent the letter. Well, how did that stop... How does doing a lineup stop them from going on the internet? Well, Judge, if we had a lineup and they didn't pick out my client in the lineup and in a photo array, that could have helped us dramatically. There's no constitutional right to a lineup. I understand, Judge, but I think in this scenario, knowing that they have someone they believe committed two robberies... Perhaps you're not getting back to the question I asked. How is it unnecessarily suggestive? Because I believe that it prompts the victims to go onto the internet and to access a government-created mugshot. But for the fact that this is the 21st century and that government-created mugshot is on the internet, accessible to anyone that wants to find it, it creates a constitutional taint on this identification. Right. That's a good segue to get here from Mr. Sanders. Thank you, Your Honor. Good afternoon. Steve Sanders. I'm back to the United States for the appellee. If we could just pick up with the point that's being made, in effect, the theme of Mr. Ambrosio, which is that if the government writes to a witness informing her of the suspect's name, isn't it, in this digital age, extremely likely that that person will do a Google search, in effect? I don't know if it's extremely likely, Your Honor, but here's the key thing. That letter was directed to the victim of robbery number one. So even if we get past my argument that it's not unnecessarily suggested because it was legally mandated, sure, if that letter had been sent to Ms. Ojeda, the victim in robbery number one, and then she had to pick someone, right, she went on the internet and looked at a photo, right, and then picked him and identified him because of that, you might have an argument that as to that robbery, it was suggestive and unnecessary. So, but there was no identification testimony offered at trial with respect to that first robbery, right? That was solved through DNA. And contrary to what my friend says, number one, there was no reference to DNA in the victim witness letter. That was basically Attorney Spinnett's argument that it may have implied to the people who were present at the first. But both cases were consolidated for trial. They were, and there was no motion for severance made, right? There was no motion for severance. So there's no... No, there's going to be some spillover effect. Correct. But no one argued that, you know, that, I mean, the jury was instructed, as it always was, that they were, that each count was separate and they're to consider them separately. So there's no argument that because he committed the robbery the first time, he must necessarily be the one who committed the second time. But the robberies were intertwined. I want to get back to the DNA point also. The argument about contamination of the DNA. There was a scarf that had a hat wrapped inside it. The agent on the scene, the officer who picked that up, did not realize at the time that the hat was inside the scarf. When he got back to headquarters and opened it up, he realized there were two pieces of evidence in there. Now, one of those items had DNA from two people, but the sunglasses, which Mr. Jones discarded at the scene of that first robbery, right, which were also tested, those came back with only one person's DNA and it was Mr. Jones's. So there's no, there's no way to assail the DNA evidence on that first robbery. So let me get to why I came here. And that's to argue that there is no state action with respect to that second robbery, the only one for which we offered identification testimony. And Judge Estrepo, you asked a question about Perry. You say she only had identification testimony for the second robbery? Right, in court. What about Ford? Didn't she testify as to the first robbery? Yes, but she described only the general physical characteristics, right? Because the robber she saw, when she, if you watch the video, you see her come into the bank, right? And you see her take her jacket off and she realizes the robbery is in progress. She grabs her jacket and runs outside to the payphone. So she's only at that point, seeing someone from behind and at an angle whose face is covered. And when she's at the payphone, the testimony shows that the robber is running away from her. And then the dye pack explodes. And as he's running away, he starts shedding his garments. But she never sees his face and doesn't describe his facial features, just describes height, build. I think that was it. So there's no, there's no, what we'd call an eyewitness identification. There wasn't an offered for the first robbery. Couldn't the Essex County Prosecutor's Office have waited until the police conducted a witness identification before sending that letter? I mean, in theory, they could have, by way of explanation only. And this doesn't appear in the record, but I think what happened here is the first robbery, because no gun was involved, was primarily being investigated by state authorities. The second robbery, the FBI took jurisdiction over, even though they were working with the state authorities, because a gun was used. And I, from what I can understand, what happened here is, after Mr. Jones was arrested for the first robbery, the information that it takes time to get to the FBI agents who are responsible for the second robbery. And that explains the two-month lag in them coming. They were on their way to the bank that day in April or May of 2015 with the six-pack to show the tellers when they realized the tellers had already identified Mr. Jones. Why shouldn't the district court have at least held a suppression hearing here? Because without state action, there's no suppression remedy. So if there's no state action, then the district court is correct to say that a hearing would have been superfluous. And I'll explain why I think you can harmonize Perry, this case, Shavers, all the cases that are distinguished between state action and non-state action. In all the cases that found state action, the government has done something to put the victim or witnesses in the same place, whether same physical space or electronic space, as the defendant, right? You say electronic space? Well, I mean... Isn't that what happened here? I mean, in Perry, the woman was on site, so to speak, when the police approached her. And in this case, the government made the overture and directed her, following Mr. Ambrosio's argument, directed her to the cyberspace where the picture would be found. But they didn't do that. There's no... There's nothing in the letter that instruct... That it didn't contain a picture and it didn't contain instructions about where to go that urged them to go find those pictures. And the cases that have said that releasing a booking photo to the media without more as a state action is because they say that not taking the additional step of telling the victims or witnesses to go watch the news or do something isn't putting the two together. I mean, in Shavers, you had them putting the witness who was in custody in the same holding cell as the defendants, right? They were in the same physical space. But if under my friend's rule, if you were to adopt his rule, the police could never announce charges, right? They could never inform the victim because at some point the victim, if she gets a notice, is going to come to court and is going to see the defendant sitting there, right? And then... Does that statute require that the person they arrest be named or just that an arrest has been made in a particular case? I don't know that the statute requires that the name of the defendant... I'll have to check that. But they are entitled to be updated on the progress of their case. And I assume... Let's assume the statute says there is no requirement that the person, the defendant be named, just that an arrest has been made in a case where you were victimized. Would that change your matrix at all? In that they inserted the defendant's name in this case? I don't know because, I mean, in this day and age, we're busy court calendars. If there's... It'd be hard for a victim to come to court and know which case, right? If they're allowed to follow the proceedings, they're allowed to talk with the prosecutor about the progress of the case. It'd be very hard to do if he didn't know which case they were talking about. I would like to get to... The court will bear with me. If we get past the state action part, which I hope this court won't, I think you can harmonize this case with Perry and say it falls on the Perry side of the line and not the Shavers and Emmanuelle side of the line, right? Emmanuelle, I think the court... I think all the parties assumed that that was state action when the defendants were frog-marched in manacles in front of the witnesses who were sitting outside of court. But if you get past that, again, you still have the question whether it's unnecessarily suggestive and because there's a legally mandated requirement to send that letter as to the first robbery, right? No one would be sustaining the claim my adversary makes if they had sent out this letter to Ms. Ojeda and she goes on the internet and she looks up a picture and she says, you know what? That's the guy who assaulted me five years ago in college, right? No one would say that that was an identification procedure, let alone a necessarily suggestive one as to that other crime, right? In this case, it's a happenstance that the same bank was victimized twice. But under my adversary's rule, they would have... the police would then be responsible for finding out if there are any open cases involving this victim and would have to somehow make these Herculean efforts not to potentially risk tainting a later identification. Judge McNulty, I think, properly said that yes, the police could have done more, but the same was true in Perry, right? They could have whisked the defendant out of the parking lot. It was certainly just as foreseeable that the witness would walk over the window and point down to the only person in the parking lot who's being detained. So that's my argument on the unnecessarily suggestive part. If you get past that, then on the harmless error question, Judge Amber, you were the author of Brownlee, as you're well familiar with the factors, right? Even if this... and the government is not disputing that this is a suggestive situation, but that's not the cynical amount of suppression, right? Even if it's suggestive, you look at the five factors, the opportunity of view, the degree of attention, the accuracy of the prior descriptions, all those things, including here right down to the salt and pepper goatee. If you look at page 150 of the record, that's the government's pretrial motion on the eyewitness identification. On the expert testimony, we had put the mugshots and contrasted them with screen grabs from the video. And certainly, especially the profile one of Mr. Jones stands out. You see the goatee, you see the gaunt feature. And so I think, as Judge McNulty said, and as Perry said, normally we leave issues of reliability to the jury. And here you had jury instructions, you had expert testimony on eyewitness identifications. The time factor isn't on your side, though, is it? It's not. It's six months, but it's not in some cases it's gone out over a year. This is six months later. My adversary keeps pointing to the fact that Ms. Gente couldn't identify the defendant in the courtroom. But as the prosecutor said on rebuttal, there's a reason why she didn't, and she was scared. You know, he said, did she look like somebody who wanted to be in this courtroom? I mean, she clearly got scared when the moment came. And to my friend's point, you know, why ask a question in front of the jury you don't know the answer to? He said, we're not going to ask her or ask Ossador. Isn't it a fact the only reason you're picking him out as a guy who did it is because you saw the mugshot? Well, I'd like to point out that they had investigators that went out and talked to at least Ms. Gente. And if they had thought that there was any argument, right, that they had gotten something out of that interview where Ms. Gente said that's the only reason why I identified him, they would have, I think, been moving to reopen the hearing to at least ask for a 403 ruling, excluding that. And they never did that. They never said that they had obtained anything valuable from interviewing Ms. Gente before trial. And the last point I'll finish off on, and I apologize to the court because I didn't spot this as I should have in reading the record. But this notion that Ms. Gente recanted, right, and contradicted what she told the agent is not actually altogether true. If you read that cross-examination of her very carefully, what happened is defense counsel, and it's a different defense counsel who tried the case, was asking her questions that put false premises into the question. He was mixing up who did what of the three tellers, and Ms. Gente, who was, I think, probably well-prepared and told not to answer questions that have false premises in them, had a hard time answering them. So he never got around to asking her, isn't it a fact you saw a picture of my client? They got so bollocked stuff with who got the letter and who did the research, right? It wasn't Ms. Gente, it was Ms. Asador. It seems very clear in retrospect that Ms. Gente was a passive observer in this whole process, and that Ms. Ojeda and Ms. Asador were the ones doing the active research and whatnot. That's why they never got to the point. So if they had asked her simpler questions, I think there wouldn't have been this so-called recantation. And what he says is the main reason for needing an evidentiary hearing evaporates. So with that, I'd ask the court to affirm if you have no other questions. Thank you very much. Thank you. As you're coming up, Asador learned of the letter from Ms. Ojeda, not the government. So isn't that make it like our 1972 case of Zyler, which is we held that the government sharing information to the press was not an identification procedure, even though a witness saw the name and the face on television. Isn't that significantly more pronounced than what happened here? My rebuttal to that argument, and I understand why you want to ask that. I believe that the fact that they were co-workers working for the same bank distinguishes that. In what way? Because they were in the same bank and they were one unit, so to speak. They work together on a consistent basis. So sending a letter to one bank employee in a small bank is equivalent to sending it to everyone. How are you supposed to know that that's necessarily going to happen? You're saying it's likely in this digital age it could happen, but how is the government supposed to know that that's going to happen? Well, Judge, in this case, the thing that distinguishes it is it's not a problem. If there was a problem, why not object to having a consolidated trial? Judge, I can't answer that question. Perhaps the attorney should have, but I didn't raise it on appeal. But I believe that the fact that the government in this case knew that it was investigating not one but two related robberies makes a difference. If this was a case where it was just a speculation, a possibility... There were two different sovereigns. The letter came from the local prosecutors, not from the U.S. Attorney's Office, right? That is correct, yes. And at some point in time after the letters when the U.S. Attorney's Office got involved. So when the letter was sent, the U.S. Attorney's Office was not involved. No, yes, they were not involved. That was state action. But I still believe that the concept holds. And one of the things I want to leave your honors with is the fact that... Wasn't the letter sent the following April? The letter was sent... April of 2015. Yes. Yeah, okay. And you're saying that the FBI was not involved because I thought the FBI got involved because whoever committed the September robbery used a gun. That's my understanding as well. So your answer to Judge Restrepo is inaccurate. The FBI would have been involved before this letter came out. Oh, I apologize for misspeaking, but it's undeniable that the letter did come from the Essex County Prosecutor's Office. Right. And in my experience, many times they don't make a decision whether or not the U.S. Attorney's Office is going to take over a case. So I think sometimes there's overlap. And this is one of those cases where there was overlap, but I still maintained that it was the Essex County Prosecutor's Office that committed the unconstitutional taint. That's not necessarily so. I mean, just because you had a prior robbery at Capital One in which a gun was not used, does not mean that the Essex County would have had a case involving the September 2014 armed robbery of that bank. That most likely would have gone to the FBI. Judge, I think the point I want to stress is a hearing, if had been held, would have established if there was a taint. And I want to leave your honors with the thought that mistaken identification is probably one of the leading causes of wrongful convictions. And when we're dealing with identifications, I think that the court should be extremely sensitive about... But what you're saying is that the jurors made a mistaken identification with regard to the film that was taken of both the May and the September robberies. Possibly. They may not even have used the video to make the determination. But in effect, what you're then saying is that there's a sufficiency of the evidence problem. And how am I to say that there's a sufficiency of the evidence problem, that the videos were clearly insufficient for the jurors to have found that Mr. Jones committed both robberies? I believe that the main evidence here was Osador's testimony, because her stating that she believed that Mr. Jones was the perpetrator of robbery number two, I believe impermissibly allowed the jury to make the assumption that, oh, then we believe that he must have been the perpetrator of robbery number one, because we have Ms. Jinty saying that it was the same voice. Do you agree with Mr. Sanders' statement that there was no identification evidence offered to support the conviction in robbery number one? Not facial identification. There was DNA evidence. And I believe that DNA evidence was, again, impermissibly vultured by Ms. Osador's testimony. Thank you very much, Your Honor. Thank you. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement and...